**NATURAL RESOURCES DEFENSE COUNCIL, INC. Petitioner,**

v.

**U.S. ENVIRONMENTAL PROTECTION AGENCY Respondent,**

**Chemical Manufacturers Association Intervenor,**

**Chicago Assoc. of Commerce & Industry, Illinois Manufacturers' Assoc. and Mid-America Legal Foundation Intervenors.**

**CERRO COPPER PRODUCTS COMPANY, and Village of Sauget, Petitioners,**

v.

**William D. RUCKELSHAUS, Administrator, United States Environmental Protection Agency,**

and

**United States Environmental Protection Agency, Respondents,**

**Natural Resources Defense Council, Inc., Intervenor.**

Nos. 84–3530, 85–3012.

United States Court of Appeals, Third Circuit.

Argued Sept. 10, 1985.

Decided April 30, 1986.

Rehearings and Rehearings In Banc Denied July 11, 1986.

Frances Dubrowski (Argued), Washington, D.C., for petitioner (No. 84–3530), for intervenor (No. 85–3012).

Richard J. Kissel, M. Therese Yasdick (Argued), Daniel F. O'Connell, Martin, Craig, Chester & Sonnenschein, Chicago, Ill., Harold G. Baker, Jr., Belleville, Ill., for petitioners Cerro Copper Products Co. and Village of Sauget (No. 85–3012).

F. Henry Habicht, II, Asst. Atty. Gen., Carl Strass, Dov Weitman (Argued), Office of Gen. Counsel (LE–1325), Washington, D.C.; of counsel Gerald H. Yamada, Acting Gen. Counsel, Susan G. Lepow, Asst. Gen. Counsel, for respondents (Nos. 84–3530 & 85–3012).

Theodore L. Garret, Corinne A. Goldstein, Covington & Burling, Washington, D.C., of counsel David F. Zoll, Frederic P. Andes, Washington, D.C., for intervenor Chemical Manufacturers Ass'n (No. 84–3530).

John M. Cannon, Susan W. Wanat, Ann Plunkett Sheldon, Chicago, Ill., for intervenors Chicago Assoc. of Commerce & Industry, Ill. Manufacturers' Ass'n and Mid-America Legal Foundation (No. 84–3530).

Before HUNTER, GARTH, and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

GARTH, Circuit Judge:

These consolidated petitions challenge an amended final rule of the Environmental Protection Agency (EPA), known as the removal credit rule, 49 Fed.Reg. 31212 (1984) (codified at 40 C.F.R. § 403.7), promulgated pursuant to the Federal Water Pollution Control Act ("FWPCA" or "Clean Water Act") of 1977, Pub.L. No. 95–217, 91 Stat. 1566 (codified at 33 U.S.C. 1251 *et seq.*).

The Clean Water Act of 1972 set as a national goal the elimination, by 1985, of the discharge of pollutants into the nation's

navigable waters. Pub.L. No. 92–500, 86 Stat. 816, § 101(a)(1) (codified at 33 U.S.C. § 1251(a)(1)). In 1977, recognizing that the 1972 Act's regulatory mechanism for the control of toxics "ha[d] failed," Congress amended the Clean Water Act to clarify and strengthen its provisions for dealing with toxic pollutants. Leg.Hist. 326–27 [1] (comments of the House manager of the bill, Rep. Roberts); *see also id.* at 369 (statement of Rep. Clausen); *id.* at 427 (statement of Sen. Muskie).

One aspect of the 1977 Act's strengthened program to control toxic pollutants was a requirement that an indirect discharger i.e. an industrial discharger whose wastes flow into a public sewage system rather than directly into navigable waters, had to "pretreat" its waste waters so as to achieve, together with the Publicly Owned Treatment Works (POTW) that treated the waste before final discharge into navigable waters, the same level of toxics removal as was required of a direct discharger, which discharged directly into a river, lake, or ocean. At the same time, the Act allowed the indirect discharger to receive a "removal credit" from the POTW for the amount of waste removed from the stream of waste water by the POTW itself. 33 U.S.C. § 1317(b)(1). This provision, designed to avoid redundant treatment, permits an increased amount of pollutants to flow from the indirect discharger's plant to the municipal treatment plant provided that the additional pollutants are removed by the municipal plant. By this process, the amount of pollutants ultimately discharged by the combination of the indirect discharger and the POTW will be no greater than the amount discharged by the direct discharger.

The Act also required EPA to develop regulations for the disposal and utilization of POTW sewage sludge, so as to prevent contamination of the sludge with toxics removed from the effluent flowing through the POTW, and so as to encourage the productive recycling of sludge. In furtherance of this goal, the Act provided that POTWs could not grant removal credits to indirect dischargers for the POTW's removal of toxics from the liquid waste stream if this removal and consequent transfer of toxics to the POTW sludge would render the sludge toxic and thus prevent sludge disposal in accordance with those regulations. 33 U.S.C. § 1317(b)(1).

NRDC challenges four aspects of the removal credit rule. First, it argues that EPA's method of calculating waste removal by POTWs violates the statutory requirement that direct and indirect dischargers be held to the same standard. Second, it argues that EPA's decision to ignore sewer overflow events in calculating the amount of toxic waste removed by a POTW violates the same requirement. Third, NRDC claims that EPA's action in modifying the test for determining when a credit must be withdrawn violates the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, and the Clean Water Act, 33 U.S.C. § 1251 *et seq.* Fourth, NRDC questions whether EPA may put into effect a relaxed removal credit rule when the sludge regulations that are a precondition for the issuance of such credits have not been promulgated.

In each of these areas, we conclude that EPA's 1984 removal credit regulations fail to meet statutory requirements. Furthermore, even extending the utmost deference to the Agency, we conclude that the promulgation of these regulations on the basis of the administrative record before us is arbitrary and capricious. Thus we grant NRDC's petition for review.

In contrast to NRDC, Petitioners Cerro Copper and Village of Sauget challenge the regulations as too strict and inflexible to take into account situations such as theirs. The petitions of Cerro Copper and the Village of Sauget will be denied.

1. Citations to the legislative history, unless otherwise indicated, are to Senate Comm. on Environment and Public Works, A Legislative History of the Clean Water Act of 1977 (Comm. Print 1978) (prepared by the Environmental Policy Division of the Congressional Research Service of the Library of Congress).

## I.

In order to understand the issues presented on this appeal, it is helpful to trace the history of the statute and regulations which were designed to eliminate the discharge of pollutants into our waters.

## A.

The removal credit rule at issue here is a part of a complex regulatory framework mandated by the Federal Water Pollution Control Act Amendments of 1972 and 1977, 33 U.S.C. §§ 1251 et seq. The statute calls for a two-phase program to limit discharges of effluents. Direct dischargers of toxic wastes were to comply with the Best Practicable Control Technology (BPT) by July 1, 1977. 33 U.S.C. §§ 1311(b)(1)(A), 1314(b)(1). Between 1983 and 1987, direct dischargers of toxic wastes were to meet the more stringent standards consistent with the Best Available Technology economically achievable (BAT). 33 U.S.C. § 1311(b)(2). The statute also mandated that the EPA set effluent limitations for POTWs engaged in the treatment of municipal sewage or industrial wastewater.[2] Id. §§ 1311(b)(1)(B)–(C), 1314(d)(1). Such limitations were to result in equal levels of treatment for all toxic discharges, whether issued directly into navigable waters or channelled by a sewage system through a POTW.

Because secondary treatment by POTWs cannot deal adequately with toxic pollutants, the statute required that EPA establish national pretreatment standards, i.e. standards to which an indirect discharger must conform in treating its waste before such waste reaches the POTW. Those standards, applicable to indirect dischargers, provide for pretreatment which is equivalent to BAT standards. 33 U.S.C. 1317(b)(1).[3]

In order to avoid redundant treatment by the indirect discharger and the POTW ("treatment for treatment's sake," Leg. Hist. 343), section 307(b)(1) of the 1977 Act, 33 U.S.C. § 1317(b)(1), requires that the POTW be authorized to give credit to the indirect discharger for removal of pollutants achieved by the POTW. The removal credit provision thereby equates the amount of pollutants removed by the combined treatment of the POTW and the indirect discharger with the amount of pollutants removed by the direct discharger operating under the relevant BAT standard. 33 U.S.C. § 1317(b)(1).

The removal credit provision was added to the statute by the Clean Water Act of 1977, Pub.L. No. 95–217, 91 Stat. 1589. That law was enacted in response to Congress's recognition of the growing seriousness of the problems of toxic pollution, and of the woeful inadequacy of the 1972 Act in dealing with them. Leg.Hist. 326–27, 454–55, 862–65.

The 1977 Act strengthened the controls over toxic pollutants in several ways. The 1977 Act explicitly codified the toxics consent decree issued by the District Court for the District of Columbia. That decree resulted from litigation brought by environmental groups to challenge EPA's failure to promulgate the effluent standards mandated for toxic substances by the 1972 Act. See NRDC v. Train, 8 Env't Rep.Cas. (BNA) 2120 (D.D.C.1976), modified sub nom. NRDC v. Costle, 12 Env't Rep.Cas. (BNA) 1833 (D.D.C.1979), modified sub nom. NRDC v. Gorsuch, No. 72–2153 (D.D.C. Oct. 26, 1982), modified sub nom.

---

**2.** There are three levels of wastewater treatment. Primary treatment refers to a physical sedimentation process for removing settleable solids. Secondary treatment refers to a physical/biological process for removing solids and pollutants characterized by biological oxygen demand and pH. Tertiary treatment involves processes which remove other pollutants such as non-biodegradable toxics. See Assessment of the Impacts of Industrial Discharges on Publicly Owned Treatment Works I:7 (report prepared for EPA by JRB Associates) (1981) (App. 192): see also Leg.Hist. 329–30. The statute requires that existing POTWs meet standards based on secondary treatment. Tertiary treatment is ordinarily provided only by industrial dischargers or by specially designed POTWs.

**3.** Section 307(b)(1) of the Clean Water Act, 33 U.S.C. § 1317(b)(1), is reproduced in its entirety in the Appendix as Exhibit A.

*NRDC v. Ruckelshaus,* No. 73–2153 (D.D.C. Aug. 2, 1983 and Jan. 6, 1984). Following that decree, Congress required that BAT effluent guidelines, applicable to direct dischargers, be developed by July 1, 1980 for the 65 toxic pollutants listed in the decree. Pub.L. No. 95–217, § 53(a), 91 Stat. 1589 (codified at 33 U.S.C. 1317(a)(2)). Also following the toxics decree, the 1977 Act amended section 307(b)(1) of the Act, 33 U.S.C. 1317(b)(1), to require EPA to promulgate pretreatment regulations for indirect dischargers analogous to the BAT standards for direct dischargers.[4] Congress stressed that pretreatment standards had to be based on BAT or more stringent limits. *See* 33 U.S.C. § 1317(a); Leg.Hist. at 271, 342, 403, 461, 690.

While strengthening and clarifying the pretreatment requirements for toxics, Congress added the following provision to the statute, thus providing for removal credits to avoid redundant treatment:

> If, in the case of any toxic pollutant under subsection (a) of this section introduced by a source into a publicly owned treatment works, the treatment by such works removes all or any part of such toxic pollutant and the discharge from such works does not violate that effluent limitation or standard which would be applicable to such toxic pollutant if it were discharged by such source other than through a publicly owned treatment works, and does not prevent sludge use or disposal by such works in accordance with section 1345 of this title, then the pretreatment requirements for the sources actually discharging such toxic pollutant into such publicly owned treatment works may be revised by the owner

or operator of such works to reflect the removal of such toxic pollutant by such works.

33 U.S.C. § 1317(b)(1).[5]

In addition, Congress sought to ensure that sewage sludge, instead of becoming a depository for toxic pollutants, should be usable as fertilizer or for other productive purposes. It did so by amending section 405 of the Clean Water Act to require EPA to develop regulations for sludge use or disposal within one year of the statute's enactment. 33 U.S.C. § 1345(d). (See Exhibit B.)

In conjunction with this amendment to section 405, Congress also amended section 307(b)(1) of the Act to ensure that EPA did not, in the course of administering the removal credit program, undermine the objective of rendering sewage sludge nontoxic and usable. By the same amendment, quoted above, that provided for removal credits, Congress also prohibited the granting of removal credits if such credits would lead to sludge contamination that would prevent the use or disposal of sludge in conformity with the section 405 regulations. FWPCA 307(b)(1), 33 U.S.C. 1317(b)(1).[6]

### B.

The removal credit regulation at issue here allows POTWs to grant removal credits to indirect dischargers so that the indirect discharger may increase its discharges of the pollutant by the amount that the POTW removes. The statute mandates that such credits be equal to the amount of toxics *consistently* removed by the POTW.

---

4. It is fairly arguable that the 1972 Act already required EPA to do what the toxics consent decree mandated. In any case, the 1977 Act clarified the congressional intent to cleanse the nation's waters of toxic pollutants.

5. As we discuss below, the concept of removal credits had already been adopted by EPA in its 1973 pretreatment regulations.

6. Congress also increased EPA's power to enforce the pretreatment program. New section 309(f), 33 U.S.C. § 1319(f), gave EPA direct enforcement authority against industrial users violating pretreatment standards, so that EPA would not be forced to rely solely on municipalities for enforcement. Amended section 402(b)(8), 33 U.S.C. § 1342(b)(8), ensured timely identification of pollutants discharged by indirect dischargers to POTWs.

New enforcement provisions were also enacted to ensure compliance with the new section 405 sludge regulations. FWPCA §§ 309(a)(1), (a)(3), & (d), 33 U.S.C. §§ 1319(a)(1), (a)(3), & (d).

The regulation requires that each POTW first determine its removal efficiency (or "consistent removal rate") for each regulated pollutant. This is generally done through a process of measuring the concentration of a given pollutant found in the waste flowing into a POTW (i.e., the influent) and then measuring its concentration in the waste flowing out of the POTW (i.e., the effluent). Removal is expressed as a percentage of the amount in the influent. If, for example, a POTW consistently removes 60% of a particular pollutant that flows into it, it can grant a 60% credit to the indirect discharger. The indirect discharger would then be permitted to discharge more than twice as much of that pollutant to the POTW than it would otherwise have been allowed to discharge.[7]

The removal credit rule is one part of the General Pretreatment Regulations for Existing and New Sources of Pollution, 40 C.F.R. § 403.1–16 (1984). These pretreatment regulations provide the framework for implementation of another set of regulations, the Categorical Pretreatment Standards, which establish specific limits for the discharge of particular toxic pollutants.

The present removal credit rule is the fourth version of the rule promulgated by EPA on this subject. The first version, promulgated in 1973, was sketchy. It foreshadowed the statutory removal credit provision of section 1317(b)(1) enacted in 1977. 38 Fed.Reg. 30982–84 (1973). In 1977, EPA promulgated more complete regulations. Each of the two succeeding versions following the 1977 version has further relaxed the requirements that POTWs and indirect dischargers are required to meet. From the first regulations through all subsequent revisions, the regulations purport to require that indirect dischargers be held to the same standard as direct dischargers, subject to credit for removal of toxics by the POTW.

In 1977, following the issuance of the toxics consent decree in *NRDC v. Train,* 8 Env't Rep.Cas. (BNA) 2120, EPA proposed more developed pretreatment regulations. 42 Fed.Reg. 6176 (1977). While this proposal was pending, Congress enacted the Clean Water Act amendments of 1977, adding the removal credit provision to section 307(b)(1). After extensive comment and participation by interested parties, including four public hearings and sixteen public meetings, which generated testimony and comments from 400 individuals and groups, EPA, on June 26, 1978, promulgated its second removal credit regulation as a part of the General Pretreatment Regulations on June 26, 1978. 43 Fed.Reg. 27736 (1978).

Following adoption of these regulations, industry and environmental groups brought several actions challenging the second removal credit provision. A settlement agreement between EPA and the industry parties led EPA to propose amendments to these regulations. 44 Fed.Reg. 62260 (1979). A third regulation was promulgated on January 28, 1981. 46 Fed.Reg. 9404 (1981).

The revised rules made it substantially easier for POTWs to grant removal credits and to give larger credits for the same pollutant removals. Several industry parties nonetheless again brought suit, contending that the new rules did not go far enough. These actions were consolidated with the actions of environmental groups challenging the 1978 and 1981 regulations, all of which were heard by this Court in *National Association of Metal Finishers v. EPA,* 719 F.2d 624 (3d Cir.1983) [hereinafter *NAMF*] *reversed in part sub nom. Chemical Manufacturers Ass'n v. NRDC,* —— U.S. ——, 105 S.Ct. 1102, 84 L.Ed.2d 90 (1985). In *NAMF,* this court upheld the 1981 removal credit rule, rejecting industry

---

7. For example, if we were to assume a standard that permits the discharge of 20 units per 1000, and if the POTW removes 60% of the pollutants found in the influent, then the indirect discharger can discharge 50 units, which will then be reduced to the permissible standard of 20 units by the POTW before the final discharge into navigable waters. In the absence of removal by the POTW, the indirect discharger itself would, of course, be required to remove all but the 20 units.

arguments similar to, or identical with, those made by EPA here.[8]

At the same time that they were attacking the 1981 regulations in court, the industry petitioners also urged EPA to suspend these same regulations so that they could be reconsidered by the new Administration. *See, e.g.,* letters from Chemical Manufacturers Ass'n. to EPA, Mar. 9, 1981 & Mar. 19, 1981, App. 145–51. In fact, EPA did defer the effective date of the 1981 regulations indefinitely, and subsequently proposed to develop yet another removal credits provision. 47 Fed.Reg. 4520 (1982).

In response to a suit brought by NRDC, this Court ruled that EPA's suspension of the pretreatment regulations without notice or opportunity for public comment violated the Administrative Procedure Act, 5 U.S.C. § 553(b)–(e), and that therefore both this initial suspension and a subsequent rulemaking proceeding, extending that suspension in part, were illegal. The EPA was therefore ordered to reinstate all of the amendments retroactively to March 10, 1981. *Natural Resources Defense Council v. EPA,* 683 F.2d 752, 768–69 (3d Cir. 1982).

EPA complied with this order on September 28, 1982. 47 Fed. Reg. 42688 (1982). However, on that same day, EPA proposed to amend the removal credit rule once again, on the grounds that it "has been criticized as being so burdensome and unwieldy as to discourage POTWs from applying for and obtaining authorization to grant removal credits." 47 Fed.Reg. 42698 (1982).

The fourth and ostensibly final removal credit rule, which is the one at issue here, was promulgated on August 3, 1984. 49 Fed. Reg. 31212 (1984) (codified at 40 C.F.R. § 403.7) (1985).[9] Among other changes, this rule adopted a new, more lenient, method of measuring the consistency of toxics removal by POTWs. The over-all effect of the new rule is that it enables POTWs to grant more and larger credits than under the 1981 rule, which itself constituted a relaxation of the 1978 rule. As a consequence, the requirements for industrial pretreatment have been very significantly reduced.

Petitioner NRDC filed a timely petition for review of the 1984 (fourth) rule, claiming that whereas the 1981 rule was in compliance with the statute, the 1984 rule has relaxed the conditions for granting removal credits beyond the bounds permitted by the Clean Water Act. Petitioners Cerro Copper and Village of Sauget, in contrast, seek to have the 1984 rule set aside on the ground that, as applied to them, the rule is more severe than the statute allows. In addition, all petitioners present procedural arguments as to why the rule is invalid.

## II.

Our standard of review of the Agency's informal rulemaking in this case is governed by section 10(e)(2) of the Administrative Procedure Act, 5 U.S.C. § 706(2), and in particular by subsections (A), (C), and (D), which provide that the reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; ... (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), & (D).

We must first determine whether the regulations are in conformity with the statute. In making this determination, the "view of the agency charged with administering the statute is entitled to considerable deference; and to sustain it, we need not find that it is the only permissible construction that EPA might have adopted but only that EPA's understanding of this 'very

---

**8.** In Chemical Manufacturers Ass'n. v. NRDC, — U.S. —, 105 S.Ct. 1102, 84 L.Ed.2d 90 (1985), the Supreme Court reversed a part of the Third Circuit's judgment in *NAMF.* However, the Supreme Court left undisturbed that portion of the judgment that dealt with removal credits.

**9.** The full text of the 1984 removal credit rule is reproduced in the Appendix as Exhibit C.

complex statute' is a sufficiently rational one to preclude a court from substituting its judgment for that of EPA." *Chemical Manufacturers Association v. NRDC*, —— U.S. ——, 105 S.Ct. 1102, 84 L.Ed.2d 90 (1985) (interpreting the Clean Water Act); *see also Chevron v. NRDC*, 467 U.S. 837, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984); *NAMF*, 719 F.2d at 637.

On the other hand, this court may not abdicate its responsibility to interpret the statute in accordance with traditional principles of statutory construction. "[W]hile reviewing courts should uphold reasonable and defensible constructions of an agency's enabling Act, ... they must not 'rubber-stamp ... administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute.'" *Bureau of Alcohol, Tobacco, and Firearms v. Federal Labor Relations Authority*, 464 U.S. 89, 97, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983) (quoting *NLRB v. Brown*, 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965)); *see also Consumer Product Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 120, 100 S.Ct. 2051, 2062, 64 L.Ed.2d 766 (1980); *International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America v. Daniel*, 439 U.S. 551, 566 & n. 20, 99 S.Ct. 790, 800 & n. 20, 58 L.Ed.2d 808 (1979); *Hi-Craft Clothing Co. v. NLRB*, 660 F.2d 910, 915 (3d Cir.1981).

Statutory interpretation is one of the traditional functions of courts. Of course, "[i]f the intent of Congress is clear, that is the end of the matter; for the court as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron v. NRDC*, 467 U.S. 837, 104 S.Ct. 2781–82, 81 L.Ed.2d 694 (1984). Furthermore, agency action in fulfillment of a statutory mandate is entitled to a presumption of regularity. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). But this presumption is not "equivalent [to] the presumption of constitutionality afforded legislation drafted by Congress." *Motor Vehicle Manufacturers*

*Ass'n.*, 463 U.S. 29, at 43 n. 9, 103 S.Ct. 2856, at 2866 n. 9, (1983). "The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." *Chevron v. NRDC*, 104 S.Ct. 2778, 2782 n. 9. We must, therefore, first determine whether EPA's position is at least "within the outer limits of its authority to interpret" the statute. *Teamsters v. Daniel*, 439 U.S. at 566, 99 S.Ct. at 800.

Second, we must examine the challenged aspects of the rulemaking procedure carefully to determine independently that the Agency has not acted unfairly or in disregard of the statutorily prescribed procedures for notice and comment rulemaking. *See, e.g., NAMF*, 719 F.2d at 637–38; *American Iron & Steel Institute v. EPA*, 568 F.2d 284 (3d Cir.1977).

Third, we must review the substantive aspects of agency action under the arbitrary and capricious standard of 5 U.S.C. § 706(2)(A). This standard has recently been described by the Supreme Court as follows:

The scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 [83 S.Ct. 239, 246, 9 L.Ed.2d 207] (1962). In reviewing that explanation, we must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., supra* [419 U.S. 281 at 285, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974)]. Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider,

entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies; we may not supply a reasoned basis for the agency's action that the agency itself has not given. *SEC v. Chenery Corp.*, 332 U.S. 194, 196 [67 S.Ct. 1575, 1577, 91 L.Ed. 1995] (1947). We will, however, "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.* [419 U.S.] at 286 [95 S.Ct. at 442]. See also *Camp v. Pitts*, 411 U.S. 138, 142–43 (1973) (*per curiam*).

*Motor Vehicle Manufacturers Ass'n v. State Farm Mutual*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). *See also Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 284, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).

We must defer to an agency's expert judgment when it is acting within the scope of the statute, but we cannot allow expertise to shield an irrational decision-making process. "[U]nless we make the requirements for administrative action strict and demanding, *expertise*, the strength of modern government, can become a monster which rules with no practical limits on its discretion.' ... We have frequently reiterated that an agency must cogently explain why it has exercised its discretion in a given manner...." *Motor Vehicle Manufacturers Ass'n*, 463 U.S. at 48–49, 103 S.Ct. at 2869–70 (citations omitted).

■ Where, as here, an agency has reversed its established interpretation of a statute, the degree of deference accorded to the agency may be somewhat lessened. As this court has said, "sharp changes of agency course constitute 'danger signals'

to which a reviewing court must be alert." *NRDC v. EPA*, 683 F.2d at 760 (citation omitted). *See also Motor Vehicle Manufacturers Ass'n v. State Farm Mutual*, 463 U.S. at 42, 103 S.Ct. at 2866 ("A 'settled course of behavior embodies the agency's informed judgment that, by pursuing that course, it will carry out the policies committed to it by Congress. There is, then, at least a presumption that those policies will be carried out best if the settled rule is adhered to.' " (citation omitted)); *Sierra Club v. United States Army Corps of Engineers*, 772 F.2d 1043, 1046 (2d Cir.1985) ("A change in something from yesterday to today creates doubt. When the anticipated explanation is not given, doubt turns to disbelief.") An agency is, of course, free to change its position, but it must supply adequate data and a reasoned analysis to support the change.

We will apply these standards of review first to the challenges raised by NRDC (parts III–VI) and then to the issues raised by Cerro Copper and the Village of Sauget (part VII).

### III.

#### A.

■ EPA's 1984 removal credit rule provides that the combined *amount* of toxics removed by an indirect discharger and a POTW must equal the amount of toxics removed by the direct discharger. However, as we discuss in greater detail below, EPA's 1984 rule fails to require the same *consistency* in the removal of toxics by POTWs and indirect dischargers as is required of direct dischargers. It therefore violates the statutory requirement of section 307(b)(1) of the Clean Water Act that the indirect discharge of pollutants through a POTW must "not violate that effluent limitation or standard which would be applicable to such toxic pollutant if it were discharged by [a direct discharger]." 33 U.S.C. § 1317(b)(1) (1977).

■ The BAT (Best Available Technology) limitations and standards issued under the statute require direct dischargers to

remove a certain *amount* of each toxic pollutant with a certain degree of *consistency*. BAT limitations and standards have at all times contained these two requirements.[10] Thus, the statutory mandate that the indirect discharger and the POTW together must achieve the same standard of treatment as is required of the direct discharger requires that the standard of treatment be the same both in *total amount* of toxics removed and in the *consistency* of such removal.

The BAT limits applicable to direct dischargers are based on empirical studies of the amount and consistency of removal that can be achieved by a well-designed and operated plant. These limits require consistency of removal in two important respects. First, they are set so that a discharger can be in compliance virtually all the time. *See, e.g., General Pretreatment Regulations,* 43 Fed.Reg. 27743 (1978). "Guidelines are generally calculated with a 99% confidence level. Therefore, if a discharger exceeds the effluent limitations established by the guideline regulation, there is a 99% certainty that it was caused by discharger error rather than statistical variation." *National Pollutant Discharge Elimination System Permit Regulations,* 49 Fed.Reg. 38019 (1984). Second, the limits fix precise daily maxima as well as monthly averages, neither of which may be exceeded by the direct discharger. The indirect discharger and the POTW must achieve an equivalent consistency in these two respects.

When Congress enacted the 1977 amendments, many of the BAT effluent limitations applicable to direct dischargers had already been promulgated and others were near promulgation. All of them were set so that they could be met 99% of the time, and all of them contained monthly averages and daily maxima. *See, e.g.,* 40 C.F.R. §§ 129.102–129.104 (1984) (effluent standards for endrin, toxaphene, and benzidine); 40 C.F.R. pts. 405–469 (1984) (effluent limitations guidelines for various industrial categories). Congress, in its 1977

amendment to section 307(b)(1) of the Clean Water Act, used the term "effluent limitation or standard," thereby incorporating the consistency requirement of that term into the removal credit provision and making the requirement applicable to POTWs and indirect dischargers.

■ As previously noted, the Clean Water Act of 1977 not only required indirect dischargers to meet standards equivalent to the BAT standards required of direct dischargers, but also provided for removal credits to avoid redundant treatment of wastes by the POTW and the indirect discharger. It is evident to us, from our reading of the statute, that such removal credits should be made available only when both the consistency and amount of treatment are indeed equivalent to BAT standards.

Under the guise of preventing redundant treatment, EPA has defined the term "consistent removal rate" to encompass POTW pollutant removal that is not consistent at all. Yet in promulgating the first full removal credit rule, in 1978, EPA stated:

Since direct dischargers are required to comply with their effluent limitations at all times, the EPA believes that the pollutant removal claimed by a POTW should be that removal which occurs virtually all of the time. As used in the regulation (§ 403.7), "consistent" removal is the removal capability that a POTW achieves in 95% of the representative samples taken.

43 Fed.Reg. 27743 (1978). By permitting inconsistent removal, EPA also permits the granting of credits for treatment that is not redundant but mandatory under the statute.

The 1978 rule required the POTW to conduct 12 influent/effluent samplings each year. The consistent removal rate was defined as the lowest of the 12 removal rates in the sample, under the assumption that the POTW would be removing at least that amount 95% of the time. Because POTW removal is more variable than

10. *See, e.g.,* 40 C.F.R. §§ 129.102–129.104 (1984); 40 C.F.R. pts. 405–469 (1984).

that of direct dischargers, and because EPA believed that it would be too burdensome for POTWs to determine whether they are removing a toxic with 99% consistency, EPA adopted the 95% consistency figure for POTWs as substantially equivalent to the 99% figure applicable to direct dischargers.

In response to complaints from indirect dischargers and POTWs that the 1978 removal credit provision was "unworkable" and that most POTWs would not apply for credits, this definition of consistent removal was amended in the 1981 rule to provide that the level of removal on which the credit would be based would be that achieved by a POTW 75% of the time. *See* 46 Fed.Reg. 9424 (1981). Seventy-five percent consistency was measured by averaging the lowest six of 12 POTW removal samplings. *Id.*

As noted above, the regulated dischargers still claimed that the removal credit rule was "unworkable," and pressed successfully for a further relaxation of the measurement of consistent removal. The 1984 rule, in fact, provides that "consistent removal is calculated ... as the difference between the average influent and effluent concentrations in all of the sample data." 49 Fed.Reg. 31215 (1984). Instead of basing its measure of consistent removal on an average of the *lowest six* of the twelve samplings, as the 1981 rule required, the 1984 rule bases its measure on the average amount removed in *all twelve samplings.* According to this formulation, the amount of removal achieved by a POTW *on average,* that is, 50% of the time, will determine the amount of credit an indirect discharger will receive.

In short, EPA first changed the definition of "consistent" removal from its original meaning, i.e. removal that occurs 95% of the time, to a second meaning, i.e. removal that occurs 75% of the time. EPA, then, in its 1984 rule, revised its definition of consistency to refer to removal that

occurs only 50% of the time. We find it difficult to fathom how a level of removal that is met one half of the time and exceeded one half of the time, and that contains no limit on the permissible amount of variability, can be termed "consistent."

EPA provides two justifications for the change in the definition of "consistent" removal from 75% consistency to 50% consistency. These justifications are the same ones advanced by EPA in 1981 for its shift from 95% to 75% consistency.

The first justification is that the approach used in the 1978 rule, which based the measure of consistent removal on the lowest of 12 sample removals, is "statistically unsound." Brief for Respondent at 32 (quoting 1981 Final Rule, 46 Fed.Reg. 9424 (1981)). In 1981, in justifying its shift from 95% consistency to 75% consistency, EPA outlined its thinking on this issue with commendable candor. EPA pointed out that using the lowest of the 12 samplings to define consistent removal might easily give rise to error, because "[t]he data at the extremes of this 12 point distribution have the greatest chance of being in error. Thus, if the lowest level of Removal identified were unrepresentatively low, the POTW would be held to an unreasonably small level of Removal."[11] 1981 Final Rule, 46 Fed.Reg. 9424. It would be better, EPA said, to estimate the amount removed 75% of the time rather than trying to estimate the amount removed 95% of the time, because the amount removed with 75% consistency could be measured reliably without increasing the number of samplings.

EPA admitted, in 1981, that the choice between 95% consistency and 75% consistency was not a purely technical choice of the one statistically correct method. It stated frankly that it could estimate the amount of removal required to attain 95% consistency, and thus cure the "statistical unsoundness," by increasing the number of annual samplings required of POTWs. The

---

11. We observe that twelve samplings may give a fairly good idea of how much a POTW removes on average, but they are not enough to give a reliable measure of how much pollutant a POTW removes 95% of the time.

choice of the 75% level was "admittedly a compromise," *id.*, between two policy considerations. Because POTWs generally have little incentive to apply for authorization to grant removal credits, EPA was concerned that POTWs would not apply for such authorization if the sampling and reporting requirements imposed upon them were too onerous.[12] On the other hand, EPA was concerned that the rule "ensure that a reasonably consistent level of removal is maintained." 46 Fed.Reg. 9424 (1981).

Even if EPA's reasoning might have justified a change from a 95% to a 75% consistency requirement, that same reasoning cannot justify a change from a 75% to a 50% consistency requirement if such a change violates the command of the statute. That command, as we have repeatedly observed, requires that the amount and variability of toxic discharges through a POTW not exceed those that would be discharged by a direct discharger operating under BAT-level controls.[13] The relevant question is not one of finding the one correct method of measuring consistent removal, nor of determining the easiest method of measuring consistent removal, but rather whether a removal credit based on the amount a POTW removes 50% of the time conforms with the requirement of the Act. We are convinced that it does not.

In its brief, EPA makes much of the fact that using all twelve samplings gives " 'a more reliable estimate of the *actual re-*

*moval* achieved than [did] the method employed in the 1981 amendments'." Brief for EPA at 34 (quoting Proposed Rule, 47 Fed.Reg. 42700 (1982)) (emphasis added by EPA). EPA's definition may indeed provide a more reliable estimate of the actual removal *on average*. But both the statute and EPA's own previous regulations require that the indirect discharger, in combination with the POTW, meet the same standard as the direct discharger must meet. This means not only that the total *amount* removed by the POTW and the indirect discharger together must be at least equal to that removed by a direct discharger operating under BAT controls, but also that the POTW and the indirect discharger must *consistently* meet the monthly and daily limits that direct dischargers meet.

EPA's second justification for its new definition of consistency is that it gives full effect to Congress' desire to avoid redundant treatment while still complying with the mandate of section 307(b)(1) that the ultimate discharge from the POTW must not be greater than that which would be allowed from a direct discharger.

In its statement of basis and purpose accompanying the 1981 rule, EPA argued that although "[i]n most cases the proposed calculation will indeed result in higher removal allowances and consequently less stringent ... pretreatment limits," this would not lead to the discharge of "unacceptable amounts of pollutants ... to navi-

12. EPA stated that it "seeks ... to avoid placing more extensive sampling requirements on the POTW." 1981 Final Rule, 46 Fed.Reg. at 9424 (1981). In fact, the complaints of industry commenters regarding the "unworkability" of the 1978 and 1981 versions of the removal credit rule were addressed less to the substantive standards of these rules than to the measurement and reporting requirements that they imposed. *See, e.g.,* Brief for intervenors Chicago Ass'n. of Commerce and Industry *et al.* (CACI Brief), at 4–5 (Chicago POTW did not apply for credits under earlier version of removal credits provision even though it had achieved compliance with applicable limitations): Letter to EPA from Chemical Manufacturers Association, March 9, 1981 (App. 146) (POTWs will not seek authorization to revise categorical standards even though they are removing high percentages of pollutants).

Of course, EPA may accommodate such objections, but only within the limits set by statute. The removal credit calculation, if it is to embody the necessary controls, will inevitably burden POTWs somewhat. It is up to the indirect discharger, who has a strong incentive to do so, to reach an arrangement with the POTW so that it can obtain the removal credit due it under the Clean Water Act.

13. The 1981 change from 95% to 75% consistency was never challenged in the courts. Of course, the fact that NRDC did not challenge a 1981 change that arguably led to some deviation from the statutory requirement does not bar NRDC today from challenging a rule that is clearly in violation of the statute.

gable waters." 46 Fed.Reg. 9424. EPA explained why, in its view, the change in the definition of consistent removal would not lead to POTW discharges in excess of BAT limits:

Industrial users are subject to "daily maximum" and "long term average" pretreatment limits. If the Industrial User is to meet the long term average, the User can only infrequently approach the daily maximum number in its daily discharge. For the joint treatment provided by the Industrial User and POTW to be less effective than that required of a direct discharger, a discharge by the User at the daily maximum level would have to coincide with abnormally lower removal at the POTW. The statistical complexities of the situation do not permit a numerical estimate of the number of times this might occur, but EPA expects it to be small. One comment received by EPA on this subject stated that a computer simulation of the problem showed that violations of the daily maximum would occur less than 2% of the time. *This simulation made certain assumptions concerning the statistical distributions which EPA is unable to verify, and EPA did not rely on this result in reaching a decision on the final method of calculation of Consistent Removal.*

1981 Final Rule, 46 Fed.Reg. 9424 (emphasis added). The same explanation is reiterated in EPA's Rebuttal to NRDC's Reply Brief. In essence, EPA's argument rests on the claims that the POTW will rarely perform below its average, that the indirect discharger will virtually never exceed its limit, and that the frequency with which these two events will occur simultaneously is even lower.

EPA is correct in asserting that the indirect discharger will rarely exceed its limit. That limit is set so that it can be complied with virtually all the time, and this remains true even when the limit is raised to credit the indirect discharger for the POTW's additional removal of pollutants.

But there is no evidence whatsoever to support the claim that the POTW will rarely perform below its average. In fact, this claim is blatantly contradicted by a wealth of evidence in the record, including repeated statements by EPA itself that POTW removal is extremely variable. In 1977, EPA cautioned that "extreme variability in pollutant removals experienced by POTWs" was among the factors to be taken into account in defining an approach to the granting of credits. Proposed Pretreatment Regulations, 42 Fed.Reg. 6485 (1977).

In promulgating the 1981 rule, EPA noted that "industrial pretreatment provides much superior removal of pollutants than does treatment at the POTW." 1981 Final Rule, 46 Fed.Reg. 9406. This is true, EPA said, first, because POTWs are not designed to remove toxic pollutants, and second, because "the dilution [by sewage, other industrial wastes, and, on some days, by rainwater] that occurs at the POTW causes less efficient removal ... than would be achieved by the Industrial User with its more concentrated waste stream.... Partially because removal of toxic pollutants by the POTW is incidental to its normal operations, it is also variable.... Removal of toxic pollutants by the POTW will ... be more variable than removal by treatment technologies designed to remove such toxics." *Id.* at 9406, 9407.

Most recently, in promulgating the 1984 rule, EPA once again emphasized the lack of consistency in POTW removal. 1984 Final Rule, 49 Fed.Reg. 31216. And, in its brief to this court, EPA declares that "the variability of daily removal estimates [for POTWs] may be quite large." Brief for EPA at 35.[14]

---

**14.** In fact, EPA would have us believe that the variability of POTW removal is so slight that the daily maximum will rarely be exceeded, while simultaneously arguing that the variability of POTW removal is so great that the 1981 rule must be relaxed. EPA argues that if POTWs are forced to take their *variability* into account, they may be prevented from authorizing credits large enough to fully reflect *average* actual removal. Disregarding the fact that the statute requires

The data from EPA's 1978 study of 40-POTWs provide ample confirmation of the variability of POTW removal. These data clearly reveal that a POTW may remove virtually all of a particular pollutant on day one while removing little or none of that pollutant on day two. *See, e.g., Determining National Removal Credits for Selected Pollutants for Publicly Owned Treatment Works*, EPA 440/2 82–008, at B25–B28 (1982) (showing removal of silver on 6 different days for 16 POTWs). In contrast, most BAT limits provide that the discharge for any one day cannot be more than double the average limit for the month as a whole. *See* 40 C.F.R. pts. 405–469 (1984).

The amount of variability (or inconsistency) in POTW removal is particularly important where the removal credit is great. In this situation, most of the removal required in reaching BAT-equivalent levels of treatment will be performed by the POTW, not by the indirect discharger. Thus, the consistency of performance that the indirect discharger achieves in removing the small share of the toxics that it must remove will be relatively unimportant in comparison to the large amount of variability in the POTW's performance in removing the larger share for which it is responsible. *See* NRDC's Reply to EPA's Rebuttal.

It is not at all unusual for removal credits to be in the 80 to 90 percent range. Especially using the method of calculating consistent removal permitted by the 1984 rule, such large credits are very common

for many toxics. *See, e.g.*, applications for removal credit authority from Chicago and Los Angeles County, App. 340–41, 344, 346–48. In such cases, the POTW by itself is responsible for removing between 80% and 90% of the pollutant. When this is so, the variability in the removal performance of the POTW will be almost fully reflected in variability in the final discharge into navigable waters.

As noted above, EPA admitted in 1981 that it had no reliable evidence to support its contention that the joint treatment by the indirect discharger and the POTW operating under a 75% consistency requirement would only rarely exceed the BAT limits that direct dischargers must meet. Yet in 1984, again without presenting any evidence, and in the face of a substantial body of evidence to the contrary collected by EPA itself, including EPA's own assertions, EPA claims that a measure of average removal (or 50% consistency) will not lead to violations of the variability limits imposed on BAT dischargers.

In fact, as we have seen, the evidence on POTW variability in the record shows that the measure of consistent removal under the 1984 rule will frequently allow discharges very substantially above the daily and monthly maxima that BAT dischargers must not exceed. Under EPA's rule, the parity in removals between direct and indirect dischargers that is mandated by the statute is guaranteed, if at all,[15] only over the space of a year.

---

compliance with *both* the consistency requirement and the amount requirement, EPA argues that it is justified in ignoring variability. Brief for Respondent at 35–36. Here, as in its argument that the measurement of consistent removal is too difficult, EPA's position is that it should be allowed to avoid the plain command of the statute because compliance with the statute would lead to the granting of fewer removal credits.

15. Unlike the POTW operating under a 50% consistency requirement, the direct discharger, required to operate under a 99% consistency requirement, cannot offset its bad days against its good days. Because it needs a margin of safety, the direct discharger will operate well within its limits, removing more pollutant than it is required to. As a result, it is likely that

even as regards total amount removed over the course of a year, the combined performance of POTW and indirect discharger will not equal that of the direct discharger.

EPA argues that if the POTW were required to operate under a 99% (or a 95%) consistency requirement, it would be forced to remove more toxics on average than the BAT discharger, because the POTW's greater variability would require it to set itself a higher level of average removal in order to meet the consistency requirement. Contrary to EPA's assertions, however, such treatment would not be redundant. Indeed, it is necessary if the POTW and the indirect discharger are to comply with the consistency requirements of BAT limitations or standards.

If there could be any doubt regarding the fact that EPA's 1984 rule is in derogation of the statute's mandate, it is dispelled by a consideration of the legislative history of the 1977 Act. In enacting the removal credit provision in 1977, Congress had two purposes. Congress' first, and overriding, concern was to ensure that the combined treatment by the indirect discharger and the POTW is equal to that by the direct discharger operating under BAT limits. Secondly, as a subordinate goal, Congress sought to avoid redundant treatment by the indirect discharger and the POTW insofar as this is possible without compromising the primary goal of parity.

The first major water pollution control legislation, the Clean Water Act of 1972, stated in its first section, entitled "Declaration of Goals and Policy," that "it is the national policy that the discharge of toxic pollutants in toxic amounts be prohibited." 33 U.S.C. § 1251(a)(3).[16] As we have noted above, Congress's concern with the problem of toxic pollutants led it to strengthen the provisions for dealing with toxics in the 1977 Act. The Conference Report was explicit in stating that "[t]he combination of pretreatment and treatment by the municipal treatment works shall achieve *at least* that level of treatment which would be required if the industrial source were making a direct discharge." Leg.Hist. 271 (emphasis added). This point was reiterated by Representative Roberts, the House manager, in presenting the conference bill to the House. Leg.Hist. 343.

The Senate Report suggests that Congress wished removal credits to be granted sparingly. The Report notes that with the exception of a few POTWs specifically designed to treat industrial wastes, POTW treatment of wastes is too variable to allow the assumption of a specific level of removal. Comm. on Environment and Public Works, Clean Water Act of 1977, S.Rep. No. 370, 95th cong., 1st Sess. 58 (Leg.Hist.

691). The Report also points out that the toxics removed through secondary treatment by a POTW would simply be transferred to the sewage sludge, creating further disposal problems. "In the long run," the Report notes, "the only real solution to the problem of safe disposal of toxic or hazardous industrial pollutants is in their reuse and recycling by industry, not the transfer of such materials from [an] industrial waste stream into municipal waste streams...." *Id.* This can only be accomplished by pretreatment of the pollutants by the industrial discharger. Congress's reasoning suggests that it did not intend the removal credit provision to be interpreted too generously, and it certainly did not intend that provision to be interpreted so as to nullify the protections it was then enacting against toxic pollution.

Finally, the EPA itself has stated that the statute requires that POTW removal be highly consistent before a credit could be granted:

> In order to justify allowing a revision to a categorical pretreatment standard the pollutant removal claimed by a POTW must occur virtually all the time. The EPA believes that a stringent interpretation of "removal" is warranted in light of the policy of the Act to prohibit the discharge of toxic pollutants in toxic amounts (section 101(a)(3)), and the application of section 307(b)(1) to section 307(a)(1) toxic pollutants.

1978 Final Rule, 43 Fed.Reg. 27765 (1978).

Nothing in the language of the statute or in the legislative history suggests that Congress intended to permit, let alone require, that removal credits be granted when these credits would result in discharges that would violate the daily maximum and monthly average limits under which direct dischargers must operate.

We do not believe that Congress' mandate for the removal of toxic wastes should

---

**16.** As Representative Roberts, manager of the legislation in the House, said in introducing the conference bill in 1977, the Clean Water Act of 1972 "fully intended that toxics be regulated. They have not only polluted drinking water and destroyed both commercial and sport fishing, but in many major water bodies they also constitute a hazard to aquatic environment and public health that has yet to be fully recognized." Leg.Hist. 327.

be subject to exceptions dictated by the convenience of the dischargers. The reason for requiring polluters to meet daily and monthly limits as well as long-term limits is obvious: a single concentrated discharge of a toxic pollutant can do irreparable damage to the ecology of a body of water, killing fish and other life forms. Such excessive toxic discharges cannot be compensated for by a reduced discharge of water during subsequent months.[17] Under EPA's current definition of consistent removal, discharges could be above the limit for months at a stretch, so long as these above-average months were offset by below-average discharges in other months.

We therefore hold that EPA's definition of consistent POTW removal, i.e. removal that is achieved only 50% of the time, violates section 307(b)(1) of the Clean Water Act, 33 U.S.C. 1317(b)(1).

## B.

■ Even had we not held that EPA's 1984 definition of consistent removal violated section 307(b)(1) of the Clean Water Act, we would be obliged to hold that EPA's enactment of the challenged regulation was arbitrary and capricious. According the utmost deference to the Agency, we still cannot find that EPA has given reasons for its new rule that "could lead a reasonable person to make the judgment that the Agency has made." *Weyerhaeuser v. Costle,* 590 F.2d 1011, 1026–27 (D.C.Cir.1978).

In 1981, when EPA reduced the consistency requirement from 95% to 75%, it acknowledged that this reduction might lead to violations of the required parity between indirect dischargers and POTWs on the one hand and direct dischargers on the other. Yet in 1984, when EPA further reduced the consistency requirement from 75% to 50%, it did not even address the key question of whether its new measure of "consistent" removal will assure such parity. Instead, in a one-sentence explanation of the change, EPA conclusorily stated that its

new measure of consistency "provides a more accurate and equitable estimate of the actual removal achieved than the method employed in the 1981 regulation." 1984 Final Rule, 49 Fed.Reg. 31215 (1984). This statement is misleading in that it focuses solely on the amount of removal while ignoring the consistency requirement of the statute. The available evidence, to which we have previously referred, indicates that the parity required by the statute will rarely be achieved under EPA's 1984 rule.

The fact that the Agency has "entirely failed to consider an important aspect of the problem [and has] offered an explanation for its decision that runs counter to the evidence before the agency" renders arbitrary and capricious its decision to change the measure of consistent removal to what is in reality a measure of average removal. *Motor Vehicle Manufacturers Ass'n. v. State Farm Mutual,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). Without regard to Congress's overriding intent that pollutants be eliminated from the nation's waters, without evidentiary support in the record, and without adequate explanation, EPA has *de facto* deleted the consistency requirement from the removal credit rule. For this reason, without more, we are satisfied that EPA's regulation is arbitrary and capricious under the test set out by the Supreme Court in *Motor Vehicle Manufacturers Ass'n. v. State Farm Mutual,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983).

## IV.

### A.

Combined sewers are conduits that transport domestic wastewater, industrial wastewater, and, during periods of wet weather, storm water runoff. Combined sewer systems were built in major American cities before the turn of the century, at a time when the need for separate treatment of

---

**17.** As NRDC's attorney put it at oral argument, "It's not much consolation to the beachgoers on a hot day in August to know that the pollution control results for the stream or the ocean were terrific for the months of November to February."

wastewater was not yet apparent.[18] POTWs in these systems generally do not have the capacity to deal with the great increase in flow that occurs during rainfall or snowmelt. They therefore have overflow points and treatment plant bypasses to handle the excess flow during such periods. Events of overflow are referred to as "combined sewer overflows" (CSOs). The 1981 removal credit rule contained a provision that adjusted the amount of credit that an indirect discharger could receive so as to take CSOs into account. We conclude that EPA's deletion of this provision from the 1984 rule, without any plausible explanation, violates section 307(b)(1), and in any event is arbitrary and capricious.

The 1978 removal credit rule provided that removal credits could be granted by a POTW that experienced overflow at least once a year only if that POTW was implementing an approved plan to treat and control such overflows. 1978 Final Rule, 43 Fed.Reg. 27765.

In response to complaints from indirect dischargers, this provision was modified in the 1981 rule to allow an alternative way for a POTW with overflow problems to grant credits. The POTW could calculate the number of hours per year during which overflow occurs. The removal credit would then be reduced by a percentage equal to the percentage of overflow time during the year. If, for example, overflow occurred during 15% of the year, the removal credit would be reduced by 15%.

In promulgating the 1981 rule, EPA explained that if the regulations are to meet the statutory requirement of parity between treatment by the direct discharger and treatment by the indirect discharger plus POTW.

> it is obvious that the POTW should be credited only with that removal which it actually achieves. Thus, EPA has imposed, through the provisions of [40 C.F.R.] § 403.7, several requirements

which ensure that industry standards are relaxed only to the extent that the POTW actually removes the pollutants in question.

\* \* \* \* \* \*

[Therefore,] the provisions of § 403.7(b) provide that a removal allowance must reflect those periods where industrial pollutant-bearing wastes overflow the POTW and there is, consequently, no actual removal of these pollutants by the POTW.

\* \* \* \* \* \*

Although some commenters have indicated that the foregoing requirements place unduly burdensome restrictions on the POTW wishing to request a removal allowance, the Agency believes that it has properly interpreted the statute to provide that the POTW will be credited only with that level of removal which is actually and consistently achieved. Support for this interpretation is found in the conference report accompanying the Clean Water Act and in the House debate on the Conference Report [as well as in the Senate debate on the Conference Report].

1981 Final Rule, 46 Fed.Reg. 9423.

Notwithstanding its own interpretation of the statutory requirement, EPA resorted to what it termed a "justifiable compromise" that went beyond giving credit for toxic waste which is actually and consistently removed. 46 Fed.Reg. 9426. In fact, adjusting the credit granted to the indirect discharger by the percentage of time that overflows occur does not take into account the fact that CSOs cause sudden increases in pollutant discharges into navigable waters. "[An] important characteristic of CSO ... is the intermittent nature of the discharge.... The impact of a large combined sewer overflow event on any viable aquatic biota element in the receiving water can be extremely detrimental." *Report to Congress on Control of Combined Sew-*

---

**18.** Such systems serve about 1300 municipalities, with a total population of about 38 million, most of whom live in 58 major cities along the upper East coast, in the upper Midwest, and in the far West. *Report to Congress on Control of Combined Sewer Overflow in the United States* 1–2—1–3 (EPA doc. no. 430/9–78–006) (1978).

er Overflow, supra, at ES-4.[19] A strict interpretation of the statute would, therefore, need to take into account the POTW's performance during an overflow. However, here, as with the definition of consistent removal, the Agency was concerned not to adopt an approach that would be "unduly burdensome for POTWs to implement," or that would reduce too greatly the number of POTWs able to grant removal credits to their industrial dischargers. 46 Fed.Reg. 9426.[20]

Although the 1981 CSO provision was a relaxation of the 1978 rule, and an admitted compromise, it was challenged by industry petitioners in this court. National Association of Metal Finishers v. EPA, 719 F.2d 624 (3d Cir.1983) (NAMF). The petitioners argued that "POTWs will be unable to make verifiable engineering estimates of the hours of overflow, and will thus be unable to grant removal credits." NAMF, 719 F.2d at 649.[21] This court, upholding the CSO provision, responded that "section 403.7(b) simply implements the statutory requirement that removal credits be granted only for pollutants actually removed by the POTW. Moreover a POTW unable to estimate the time, let alone the amount, of untreated wastewater overflow may not be able to accurately predict the proportion of pollutants which it will remove." Id.

In 1982, EPA proposed a further relaxation: it would entirely eliminate the overflow compensation requirement from the calculation of removal credits, on the ground that "the overflow adjustment makes a negligible difference in the final removal credit." 1982 Proposed Rule, 47 Fed.Reg. 42701. It based its conclusion on a 1978 study of 15 POTWs. See Report to Congress on Control of Combined Sewer Overflow, supra, ch. 6 passim. "Relying on frequency modeling of the rainfall characteristics of [10 of the 15] sites, the report found that combined sewers will overflow an average of 7.3% of the time." 1982 Proposed Rule, 47 Fed.Reg. 42701. A 7.3% adjustment in the removal credit, EPA stated, will led to a negligible adjustment in the discharge limit the indirect discharger is required to meet.[22] The 1984 rule did in fact eliminate the CSO provision.

### B.

The deletion of the CSO provision violates section 307(b)(1) of the Clean Water in two respects. First, EPA may not base removal credits on a purported average figure for the frequency of CSOs. To do so ignores the great variability among POTWs in the number and duration of CSO events and in the amount of bypass that occurs during such events. For many

---

19. The impact on receiving waters is augmented by the fact that pollutants are "resuspended" during CSO events. During dry weather, the sluggish flow through the sewage pipes leads to the sedimentation of some pollutants, which collect in the pipes. During rainy periods, the velocity of water flowing through the pipes "resuspends" these pollutants, and a part of them pass completely untreated into navigable waters.

20. EPA's 1981 discussion of CSOs characterized the compromise CSO adjustment factor in the 1981 rule as providing for an "average consistent removal level." 46 Fed.Reg. 9426. According to the Agency, this is a level of removal computed by taking into account "both those periods of high removal and those periods of low or zero removal." As with the definition of consistent removal discussed in part III above, here too it remains puzzling, to say the least, that removal which is high at some times and zero at others can be termed consistent. EPA's

penchant for looking solely at long-term effect spreads the quantitative impact of an overflow over many days when there are no overflows, thus understating the true impact of the inconsistency in treatment.

21. In order to simplify the POTWs' task, EPA had already permitted them to substitute "a verifiable engineering estimate of the annual hours of Overflow where actual monitoring of Overflow points is infeasible." 1981 Final Rule, 46 Fed.Reg. 9427.

22. In addition to the argument based on the "negligible" total number of hours per year of CSOs, EPA relied on an analysis of the amount of pollutants that escape treatment during CSO events at eight sites in four cities. Combined Sewer Overflow Toxic Pollutant Study, (EPA doc. no. 440/1-84/304) (1984). "This analysis indicated that, on average, eight percent of metals bypassed the POTW and were thus not treated." 1984 Final Rule, 49 Fed.Reg. 31220.

POTWs, overflow would require an adjustment of substantially more than 7.3%.

■ Second the statute does not permit EPA to raise pollutant discharge limits for indirect dischargers by 7.3%, or by any amount that is not *de minimis*, over those that are required of direct dischargers simply because it feels that an increase in pollutant discharge is not very large. This violates the requirement that treatment by indirect dischargers plus POTWs must equal that by the direct discharger, because it permits the indirect discharger and the POTW to discharge a greater total *amount* of pollutants, and because it permits POTWs and indirect dischargers to discharge waste that is largely untreated, in complete disregard of any requirement of *consistency*.

The type of average measure relied upon by EPA in deciding to delete the CSO provision is similar to the national removal rate measure proposed (in 1982) and subsequently rejected (in 1984) by the Agency as a method of determining how much credit to grant to indirect dischargers. According to EPA's 1982 proposal, a national removal rate for each pollutant was to have been set at the level which was met by roughly 75% of 40 POTWs studied by EPA. 1982 Proposed Rules, 47 Fed.Reg. 42699–700.

In rejecting the national removal credit proposal as proposed in 1982, EPA stated:

> The Agency has concluded, upon reconsideration, that Congress intended that a removal credit be granted for a particular pollutant only to the extent that a particular POTW can demonstrate that it removes the pollutant. The language of the statute, buttressed by the legislative history, indicates that removal credits are to be based upon case-by-case removal determinations, rather than upon a nationally determined rate.

1984 Final Rule, 49 Fed.Reg. 31212–13.

EPA correctly relied on the language of section 307(b)(1) of the Clean Water Act, on the legislative history of the 1977 Act, and on this court's holding in *NAMF*, 719 F.2d 624, to conclude that the enormous variability of removal performance among POTWs made the use of an average removal figure unlawful.

For the very same reasons, EPA's reliance on an average rate of "nonremoval," i.e. of overflow, cannot support its deletion of the CSO adjustment in the 1984 rule. If EPA concedes, as it does, that removal rates for individual POTWs cannot be determined on the basis of a national sample, it is difficult to see how the duration and importance of CSO events at individual POTWs can be determined on the basis of two studies of a small number of POTWs, (one of ten POTWs, the other of eight POTWs) neither of which can be deemed representative of the entire universe of 1300 municipalities.[23]

By using an average 7.3% figure for overflows, EPA fails to take into account that in some cities the percentage of time in which overflows occur is substantially greater. In Philadelphia, for example, overflows occur at nearly double the average rate. Chicago's 1984 application for

---

23. The 8–POTW study is not even mentioned in the statement of basis and purpose accompanying the rule. In any case, the data from the very small samples of POTWs that EPA has studied indicate that combined sewer systems vary widely in the duration of their overflows and in the mass of metals that bypass the POTW during overflow events. EPA appears to have relied exclusively on data from the 10 POTWs in concluding that combined sewers overflow on average 7.3% of the time. Yet these data show enormous variability from city to city. In Sacramento, the computer simulation indicated that overflow would occur 3.2% of the time, whereas in Philadelphia it indicated that overflow would occur 13% of the time. *See* The

Elimination of By-Pass Factors in the Removal Credit Package (EPA internal memorandum, Aug. 4, 1982) (App. 271). The 8 POTWs studied in the 1984 study show similar variability, both in duration and in the percentage of metals that bypass the POTW. *See* Effect of CSO's on Removal Credits, Table 3 (EPA memorandum to the record, Jan. 9, 1984).

The amount of overflow depends not only on the amount and intensity of rainfall at the city in question, but also on factors such as the design of the POTW and the system channelling wastewater into the POTW. *Combined Sewer Overflow Toxic Pollutant Study* 56 (EPA doc. no. 440/1–84/304, 1984).

authority to grant removal credits, included in the record in this case, states that in two typical pumping stations, overflows occurred 10.9% of the time. *See* Request of Authority to Revise Categorical Pretreatment Standards 25 (Metropolitan Sanitary District of Greater Chicago, 1984) (App. 343).

In addition to ignoring variability in the frequency and duration of CSOs, EPA also bases its decision on the asserted "insignificance" of a 7.3% adjustment in the discharge limit applicable to indirect dischargers. It seems obvious that a 7.3% difference in the total amount of pollutant discharged into navigable waters over the long term is not *de minimis.* As NRDC points out, EPA has in the past deemed relatively small changes sufficient to warrant promulgating new rules. For example, the Agency promulgated new pretreatment standards for electroplaters for nickel, even though the new limits were only 3% to 8% more stringent than the old ones. *Compare* 46 Fed.Reg. 9472 (1981) *with* 48 Fed.Reg. 32487 (1983). Likewise, in its iron and steel standards, EPA gave merchant coke plants different daily and monthly direct discharge effluent limits only 7% less stringent than those for other cokemaking plants. 47 Fed.Reg. 23287.

Adopting EPA's data and analysis, NRDC concludes that as a result of CSOs, indirect dischargers dispose of 560,000 additional pounds of toxics a year directly into the nation's waters. Reply Brief for NRDC at 14–15. This figure exceeds the total volume of toxics currently discharged into POTWs by eight industrial categories which EPA has nevertheless seen fit to regulate. *See Assessment of the Impacts of Industrial Discharges on Publicly Owned Treatment Works* Table 1–3 (1981) (Report prepared for EPA by JRB Associates). We need not, however, rely on this illustrative calculation to understand that combined sewer overflow is a major environmental hazard, and has been viewed as such not only by EPA, but by Congress as well. *See* section 416(c) of the Clean Water Act, 33 U.S.C. § 1375(c) (requiring the Administrator of EPA to submit report on

CSO to Congress); *see also* comments of House manager Rep. Roberts, Leg. Hist. 357 ("Combined sewer overflow is a serious pollution problem which must be addressed in order to meet the enforceable requirements of the Act.")

We therefore hold that a removal credit regulation that permits indirect dischargers and their POTWs to ignore CSOs, and thus to exceed the limits applicable to direct dischargers by 7.3% on average, and by at least 13% in some cities, is in violation of section 307(b)(1) of the Clean Water Act, 33 U.S.C. § 1317(b)(1).

### C.

EPA has failed to provide any plausible reason for deleting the CSO requirement. Nor has it provided any explanation for, or evidence supporting, a 7.3% average increase in pollutant discharges, and a discharge increase of 13% or more in certain cities. Nevertheless, it has proceeded to eliminate the CSO provision.

Neither the 1978 report on which EPA relied in its initial proposal nor the 1984 report which EPA uses to buttress this proposal even addresses the question of environmental effects. Furthermore, at the time when EPA proposed to delete the CSO provision, it cited no data whatsoever in support of its decision beyond what had been available to it when it promulgated the 1981 rule.

Even if it were admitted, which it cannot be, that deletion of the CSO adjustment would have little significant detrimental impact on the environment, the Agency has provided no explanation of why the adjustment should be deleted except to say that POTWs have difficulty measuring their CSOs. This might at most argue for the use of an average figure, but it certainly cannot provide support for deleting the adjustment entirely.

Thus, in addition to violating section 307(b)(1), the Agency's deletion of the CSO adjustment without any rational justification, and without any discussion of the

environmental effects that will result, must be deemed arbitrary and capricious.

## V.

■ The 1984 rule changed the test for determining when a removal credit has to be modified or withdrawn. Instead of acting whenever the POTW no longer fulfills the conditions justifying a credit, EPA will, under its 1984 rule, withdraw a credit before the expiration of the POTW's five-year permit only if the POTW's removal rate drops "consistently and substantially" below the rate claimed in its permit application. 1984 Final Rule, 49 Fed.Reg. 31224. We agree with NRDC that the new test violates the Clean Water Act.[24]

EPA's 1978 version of the rule had simply stated that "EPA or the NPDES State[25] can withdraw [a POTW's] authorization [to grant credits] ... upon 60 days notice of continued violation." 1978 Final Rule, 43 Fed.Reg. 27766. Later, in the 1981 version of the rule, EPA expanded upon this statement in section 403.7(f)(5). This section provided that, following notice to the POTW of a violation,

> If appropriate corrective action is not taken within a reasonable time, not to exceed 60 days unless the POTW or the affected Industrial Users demonstrate that a longer time period is reasonably necessary to undertake the appropriate corrective action, the Approval Authority shall either withdraw such discharge limits or require modifications in the revised

discharge limits [i.e. in the removal credit].

1981 Final Rule, 46 Fed.Reg. 9447.

Under the 1981 rule, action by the Approval Authority or by EPA was triggered by a determination "that such discharge limit revisions [i.e., removal credits] are causing or significantly contributing to a violation of any conditions or limits contained in the POTW's NPDES Permit." *Id.* For the definition of when a removal credit "significantly contributes to a violation," the rule referred to subsections 403.3(i) and (n) of the General Pretreatment Regulations, 40 C.F.R. 403.3(i) and (n) (1982), which define when an indirect discharger "significantly contributes" to a POTW permit violation. 1981 Final Rule, 46 Fed.Reg. 9439–40. Subsections 403.3(i) and (n) define any discharge in excess of permitted amounts as significant.

In *NAMF,* 719 F.2d 624, this provision of the 1981 removal credit rule was attacked by industry petitioners as unworkable: "Joint petitioners say that due to section 403.7(f)(5) they will be unable to rely on their removal-revised discharge limits and will be forced to install just as much control technology as if there were no removal [by the POTW] at all." *NAMF,* 719 F.2d at 649. This court responded: "We agree with EPA ... that such withdrawn or modified discharge limits, though unfortunate, are merely the recognition of the POTW's failure to remove the pollutant." *Id.*

In spite of this court's approval of the 1981 provision, in 1982 EPA proposed to amend section 403.7(f) to give the POTW

---

24. NRDC also argues that the Agency violated the Administrative Procedure Act by failing to give notice of the change in its proposed rule and by making the change without having any evidentiary basis in the record for doing so. We agree with EPA that EPA's proposal was sufficient to apprise interested parties of the subjects and issues to be addressed by the Agency in the final rule. *See American Iron and Steel Institute v. EPA,* 568 F.2d 284, 293 (3d Cir.1977); *Action for Children's Television v. FCC,* 564 F.2d 458 (D.C.Cir.1977). We also agree with EPA that this change would not require any empirical support if it were within the area of discretion that the statute left open to Agency policy-making. *See, e.g., Chevron,*

*U.S.A., Inc. v. NRDC,* 467 U.S. 837, 104 S.Ct. 2778, 2793, 81 L.Ed.2d 694 (1984) ("an agency to which Congress has delegated policymaking responsibilities may, within the limits of that delegation, properly rely upon the incumbent administration's views of wise policy to inform its judgments").

25. The NPDES state is the state issuing the POTW's permit under the National Pollutant Discharge Elimination System, through which, under section 402 of the Clean Water Act, 33 U.S.C. § 1342, the EPA and the states issue permits to dischargers, including POTWs. Such permits are issued for five-year periods.

six months to return to compliance after the initial violation. The proposal provided further that, "The Approval Authority can ... extend the time for compliance for up to one year if the POTW demonstrates good faith efforts to return to compliance." 47 Fed.Reg. 42703. NRDC, in its comments on the proposed rule, challenged the legality of this extended tolerance of POTW violations. In promulgating the 1984 final rule, the Agency responded that it "agrees that the proposed procedure.... provided too much latitude to a POTW which is experiencing problems," and it deleted the proposed change. 1984 Final Rule, 49 Fed.Reg. 31220.

However, EPA found another route to the same goal: it amended the test that determined when action by the Approval Authority or by EPA will be triggered. Under the 1984 rule, "the removal credits will generally remain set for the [five-year] term [of] the POTW's NPDES permit." 49 Fed.Reg. 31216. The removal credits can be modified or withdrawn during the permit term only if "the POTW's consistent removal rate is *consistently* and *substantially* lower than the removal credit specified in the POTW's NPDES permit." 1984 Final Rule, 49 Fed.Reg. 31224.

With this change, EPA has relaxed both the consistency and the amount of removal of pollutants required of POTWs and indirect dischargers. Under this test, even *grossly inconsistent* removal will not be sufficient cause for withdrawal of a credit; and even removal *substantially below* the required amount will not be sufficient cause for withdrawal of a credit. Only when *both* these violations occur can a credit be withdrawn before the expiration of a POTW's permit. After the credit is withdrawn, the indirect discharger may, in certain cases, have up to three more years to install the required treatment systems. *See* 40 C.F.R. §§ 403.7(f)(4)(iii) & 403.6(b) (1985). Thus, a violation of the BAT-equivalent limits required by section 307(b)(1) of the Clean Water Act, 33 U.S.C. § 1317(b)(1), may continue for up to eight years before the Agency's rules permit it to act against the violators.

EPA conceded that its proposal, made in 1982, to delay for up to 12 months the initiation of credit withdrawal procedures against a POTW that is in violation of its discharge limits would have "provided too much latitude to a POTW which is experiencing problems," even as applied to a POTW that was only slightly in violation of these limits. 49 Fed.Reg. 31220. Yet after deleting the change proposed in 1982, EPA in 1984 substituted a provision that allows a potential of up to eight years of violative discharges.

We note once again that the BAT limits are set so that, applying available technology, they can be met with 99% consistency. Removal credits must also be set so that they can be met consistently. The Clean Water Act forbids POTWs and indirect dischargers to exceed BAT-equivalent limits for substantial periods of time. Yet EPA's 1984 rule, in permitting precisely this, is in contravention of section 307(b)(1) of the Clean Water Act.

## VI.

### A.

Virtually all of the toxics that do not pass untreated through the POTW become concentrated in the sludge. The "removal" of non-biodegradable toxics, such as metals, from the wastes that flow into the POTW transfers these toxics from the POTW's liquid wastestream to the POTW's solid waste, i.e. to the sludge. *See* 1981 Final Rule, 46 Fed.Reg. 9408. For example, EPA has found that 28 of the 129 priority pollutants listed in the toxics consent decree, *NRDC v. Train*, 8 Env't Rep. Cas. (BNA) 2120, although not detected in POTW influents, had become concentrated in sufficient amounts to be detectable in POTW sludge. *The Fate of Priority Pollutants in Publicly Owned Treatment Works* 70–71 (EPA doc. no. 440/1–82/303) (1982).

Contamination of POTW sludge with toxics creates numerous problems. It makes disposal by municipalities expensive and

difficult. It may prevent productive uses of sludge, for example as fertilizer or soil conditioner, or it may introduce toxics into the food chain, where they become further concentrated. Toxics from landfills may leach into groundwater and contaminate drinking supplies. If incinerated, toxics can poison the atmosphere, harming POTW workers and surrounding communities. As EPA has noted, "It is therefore desirable to isolate these toxic pollutants in small, but concentrated, industrial sludges, rather than sending them on to the larger POTW sludge." 1981 Final Rule, 46 Fed.Reg. 9410.

This can only be done through pretreatment by the discharger. Pretreatment has other advantages as well. Toxics can be treated more efficiently when they are more concentrated and when the treatment can be designed for the specific pollutants involved. In some cases, the industry can apply technologies to recover and recycle valuable metals and organic toxics which could not be applied at the POTW.

With these considerations in mind, Congress in 1977 added subsection 405(d) to the Clean Water Act. This subsection provides as follows:

> The Administrator, after consultation with appropriate Federal and State agencies and other interested persons, shall develop and publish, within one year after December 27, 1977, and from time to time thereafter, regulations providing guidelines for disposal of sludge and the utilization of sludge for various purposes. Such regulations shall—(1) identify uses for sludge, including disposal; (2) specify factors to be taken into account in determining the measures and practices applicable to each such use or disposal (including publication of information on costs); (3) identify concentrations of pollutants which interfere with such use or disposal.

33 U.S.C. § 1345(d).

At the same time, Congress amended section 307(b)(1) of the Act to condition the granting of removal credits upon POTW compliance with subsection 405(d). Such credits may be authorized only if they do not "prevent sludge use or disposal by such works in accordance with section 405 of this Act." 33 U.S.C. § 1317(b)(1).

The 1984 removal credit rule purports to satisfy these statutory requirements by providing that credits will not be granted unless "[t]he granting of [such] removal credits will not cause the POTW to violate the local, State and Federal Sludge Requirements which apply to the sludge management method chosen by the POTW." 40 C.F.R. § 403.7(a)(3)(iv) (1985). The rule proceeds to define federal sludge requirements by reference to regulations issued under other environmental statutes. 40 C.F.R. § 403.7(a)(1)(ii) (1985).

#### B.

EPA argues that NRDC's challenge to this portion of the removal credit rule is time-barred. Section 509(b)(1) of the Clean Water Act provides that a petitioner may obtain review of such a rule if a petition is filed "within ninety days from the date of ... promulgation, ... or after such date only if such application is based solely on grounds which arose after such ninetieth day." 33 U.S.C. § 1369(b)(1). EPA argues that because the sludge regulations have remained unchanged "for the past six years," they cannot be challenged in this court now. Brief for EPA at 21.

This argument is not persuasive. First, the 1984 rule differs from its predecessor rules, both in its sludge provisions and in other significant features which affect sludge contamination. Second, regardless of any differences between the 1984 rule and earlier rules, EPA submitted the entire 1984 rule for public comment.

Third, we are empowered to entertain NRDC's claim because NRDC bases its argument on "grounds which arose after [the] ninetieth day" following promulgation of earlier removal credit rules, as provided by 33 U.S.C. § 1369(b)(1). EPA's sludge regulations were already overdue in 1979, when EPA called for comments on the 1981 rule, but at that time EPA was only one

year beyond the statutory deadline, and the sludge regulations were said to be close to proposal. Yet as of October, 1985 the Federal Register revealed that the section 405(d) regulations had yet to be proposed, let alone promulgated. A final rule is now promised for July, 1987. Current and Projected Rulemakings, 50 Fed.Reg. 44672 (1985).

For these reasons, we hold that EPA's failure to promulgate these regulations and the others required by section 405 as a precondition to the granting of removal credits defeats its contention that NRDC is time-barred in its challenge.

### C.

NRDC argues that the removal credit rule, as it pertains to sludge, is in violation of the statute because no regulations under section 405(d) have been promulgated by EPA. As a consequence, NRDC argues, no removal credits can be authorized. NRDC rejects EPA's contention that the regulations which have been issued under other environmental statutes constitute section 405(d) regulations, claiming that such a "grab-bag" of regulations cannot constitute the comprehensive framework of sludge regulations required by Congress in sections 405(d) and 307(b)(1). EPA, on the other hand, asserts that its rule, by incorporating regulations issued under other environmental statutes, meets the requirement of section 405(d) that "the Administrator ... shall develop and publish ... regulations providing guidelines for the disposal [and utilization] of sludge...." 33 U.S.C. § 1345(d). EPA argues that because such sludge regulations exist, removal credits may be authorized under section 307(b)(1).

Section 405 sludge regulations must "specify factors to be taken into account in determining the measures and practices applicable to each" method of utilization or disposal of sludge, and "identify concentrations of pollutants which interfere with such use or disposal." 33 U.S.C. § 1345(d).

According to a report prepared for EPA, the major methods of sludge disposal are landfill (51% of total tonnage), incineration (31%), land spread (8%), and ocean dumping (11%). *Assessment of the Impact of Industrial Discharges on Publicly Owned Treatment Works* I:10 (1981) (report prepared for EPA by JRB Associates). For each of these methods, EPA must set limits of concentration for each of the priority pollutants found in POTW sludge. EPA's 40–POTW study found that over 100 of the 129 priority pollutants are to be found in sludge. Forty of these were detected in at least 10% of the samples, and 24 of these were detected in at least 50% of the samples. *Id.* at B54.

■ A number of regulations issued under other statutes do affect aspects of sludge disposal, and they are referenced by the removal credit rule. In promulgating the 1981 rule, EPA stated that "the section 405 regulations will, to a large degree, simply reference the existing requirements." 46 Fed.Reg. 9428. However, this regulatory patchwork, sewn together from pieces of regulations authorized by other statutes, is able to protect against only a few of the most extreme environmental consequences of sludge contamination. We agree with NRDC that the regulations referenced in the current rule, which are if anything fewer than those listed in the 1981 rule,[26] do not, nor were they intended to, provide the comprehensive standards for sludge disposal intended by section 405(d). They leave many aspects of sludge disposal completely unregulated.

For example, EPA has defined safe limits for two toxics, cadmium and PCBs, but only when they are landfilled or land spread. Mercury limits are defined only for incineration. Landfill regulations issued under the Resources Conservation and Recovery Act, 42 U.S.C. 6901 *et seq.,* specify impermissible concentrations of certain metals in ground water, but they do not specify such concentrations for sludge.

---

**26.** The 1981 rule referenced the regulations on distribution and marketing of sludge products, which were listed as forthcoming. There is no mention of these regulations in the 1984 rule.

Distribution and marketing regulations, which were in the preproposal draft stage in May of 1980 but which have still not been proposed, would, according to EPA, provide additional limits on cadmium and PCBs, as well as restrictions on toxic metals in sludge products. 1981 Final Rule, 46 Fed.Reg. 9428. Certainly, the existing regulations do nothing to advance the congressional goal of making sludge into a productive asset rather than a toxic liability.

Not only do we reject EPA's argument that it may refer to other regulations in order to satisfy its statutory obligation to enact sludge rules, but EPA's position is belied by letters from EPA's Administrator to the chairman of the Senate Oversight Committee. On June 28, 1983, EPA Administrator Ruckelshaus, in response to a letter of inquiry from Senator Robert Stafford, Chairman of the Committee on Environment and Public Works, wrote:

> I believe that I can, however, commit at this time to promulgating within two years a basic regulation which will establish the programmatic framework for sludge management, list the significant pollutants found in sludge, list sludge uses, and specify factors to be taken into account in determining measures and practices to be applied to the various sludge uses and disposal practices, and issue concentration criteria for those key pollutants for which we now have adequate scientific information to develop regulatory standards.

Letter from Administrator Ruckelshaus to Senator Stafford, June 28, 1983 (App. 349).

Nearly a year later, Administrator Ruckelshaus again reported to Senator Stafford as follows:

> We are well underway in our work on several aspects of the technical regulations required by section 405 of the Clean Water Act. I know that these regulations are of special concern to you. We have identified more than 30 pollutants found in sludge that are of initial concern, and we have identified the sludge uses we will regulate. We have begun

to assemble the background data and documentation for the regulatory record.

Letter from Administrator Ruckelshaus to Senator Stafford, May 22, 1984 (App. 352). These letters clearly recognize EPA's failure to promulgate the section 405 rules.

 We hold that despite EPA's contention that sludge regulations are in place, EPA's device of incorporating other regulations does not meet the statute's command for a comprehensive framework to regulate the disposal and utilization of sludge, and that EPA cannot, in the absence of the section 405 regulations, authorize the issuance of removal credits under section 307(b)(1).

### VII.

The Village of Sauget, Illinois operates a POTW that treats waste from nine industrial users, which waste accounts for 98% to 99% of the POTW influent. Cerro Copper is one of the indirect dischargers using the Sauget POTW. Sauget and Cerro challenge EPA's removal credit formula and complain that the Agency has failed to respond publicly to their comments and has failed to take into account the uniqueness of their situation.

These petitioners presented exactly the same substantive issues in a petition filed in the Seventh Circuit challenging the 1981 removal credit rule and EPA's 1983 pretreatment standards for the copper-forming industry, 40 C.F.R. pt. 468·(1984). The Seventh Circuit "summarily dispose[d]" of the petitioners' attack on the national pretreatment standards for the copper-forming industry, pointing out that EPA's rulemaking was not addressed to the situations of individual POTWs and that the statute clearly intended that the rules should be national in scope. *Cerro Copper Products Co. and Village of Sauget v. Ruckelshaus*, 766 F.2d 1060, 1067 (7th Cir.1985). As to Cerro and Sauget's challenge to the removal credit rule, the court stated that it was without jurisdiction to entertain a challenge to a 1981 rule in a petition filed in November, 1983. *Id.* at 1069.

Possibly anticipating the Seventh Circuit's response to their challenge to the 1981 removal credit rule, on November 16, 1984, Cerro and Sauget filed a timely petition for review in the Seventh Circuit challenging the *1984* rule. In an order dated January 7, 1985, the Seventh Circuit transferred this petition here, where it was consolidated with the previously filed petition of NRDC.

For the reasons discussed in part VI above, we reject EPA's contention that Cerro and Sauget's challenge to the removal credit rule is barred because it regards an aspect of the rule that remains basically unchanged from the 1981 rule. However, we find no merit in Cerro and Sauget's procedural and substantive challenges.

■ First, we observe that EPA is not required to answer publicly every comment, no matter how frivolous, but only to comment on major issues that are central to the exercise of its regulatory discretion. *Action on Smoking and Health v. C.A.B.*, 699 F.2d 1209, 1216 (D.C.Cir.1983) (agency must address major comments); *American Standard, Inc. v. United States*, 602 F.2d 256, 269 (Ct.Cl.1979) (purpose of statement of basis and purpose is to enable reviewing court to exercise its function); *National Nutritional Foods Association v. Weinberger*, 512 F.2d 688, 701 (2d Cir.1975) (same). Cerro and Sauget's claim that their situation is "unique" hardly presents a major issue. EPA responded by letter to petitioners' claim several times. On the issue of removal credits, the Agency responded twice, once on December 8, 1982, and again, in much more detail, on June 15, 1984. *See* App. 326–27, 328–36.

■ Cerro and Sauget's argument boils down to nothing more than a claim that EPA's rule violates the intent of section 307(b)(1) because it does not exempt Cerro

from the pretreatment requirements. They argue that the treatment of Cerro's wastes by the Sauget POTW is "adequate," so EPA's formula must be faulty. However, it is Cerro and Sauget's proposed method of calculating pollutant removal that is flawed. It amounts to nothing more than seeking removal credit for dilution of pollutants, a "solution" that Congress has explicitly ruled out. Leg.Hist. at 691. *See also* 40 C.F.R. § 403.6(d). EPA has simply concluded, based on the information provided to it by Cerro and Sauget, that the Sauget POTW's current waste removal does not meet the standards set by EPA.

Cerro and Sauget argue further that the treatment provided by the Sauget POTW will, in a year's time, be augmented by the treatment provided at a regional POTW now under construction. That POTW will receive wastes from the Sauget POTW and treat them further before discharging them into navigable waters. Cerro and Sauget claim that EPA must consider the joint operation of the two POTWs in calculating the removal credit due Cerro.

■ This is an issue regarding the implementation of the removal credit rule, and is therefore not one that is properly addressed here. If Cerro and Sauget disagree with EPA's application of the rule to them, they will be able to challenge this application in court.[27] *See Bethlehem Steel Corp. v. Gorsuch*, 742 F.2d 1028, 1033 (7th Cir.1984); *Tanners' Council of America, Inc. v. Train*, 540 F.2d 1188, 1196 (4th Cir.1976). Their present demand for a promise of exemption on the basis of hypothetical treatments by an as yet uncompleted POTW is premature and irrelevant to the national removal credit rule.

## VIII.

We have concluded that EPA's 1984 removal credit rule fails to meet the require-

---

**27.** We note that EPA does not disagree with petitioners' interpretation, but simply states that it will consider their case when they are able to produce the relevant data. As EPA has told petitioners, "Once this information [on the removal efficiency of the as-yet-uncompleted regional POTW] is available, the need for pretreatment at the industries may be eliminated through application of removal credits, if the combined treatment of the facilities at Sauget and [the regional POTW] sufficiently removes the pollutants...." Letter from Bruce R. Barrett, Director, Office of Water Enforcement and Permits, EPA, to Richard J. Kissel, Esq., December 8, 1982 (App. 326).

ments mandated by statute. We will therefore grant NRDC's petition for review at No. 84–3530.

The petition of Cerro Copper and the Village of Sauget at No. 85–3012 will be denied.

## APPENDIX

### Exhibit A

Section 307(b)(1) of the Clean Water Act, 33 U.S.C. § 1317(b)(1), provides as follows:

The Administrator shall, within one hundred and eighty days after October 18, 1972, and from time to time thereafter, publish proposed regulations establishing pretreatment standards for introduction of pollutants into treatment works (as defined in section 1292 of this title) which are publicly owned for those pollutants which are determined not to be susceptible to treatment by such treatment works or which would interfere with the operation of such treatment works. Not later than ninety days after such publication, and after opportunity for public hearing, the Administrator shall promulgate such pretreatment standards. Pretreatment standards under this subsection shall specify a time for compliance not to exceed three years from the date of promulgation and shall be established to prevent the discharge of any pollutant through treatment works (as defined in section 1292 of this title) which are publicly owned, which pollutant interferes with, passes through, or otherwise is incompatible with such works. If, in the case of any toxic pollutant under subsection (a) of this section introduced by a source into a publicly owned treatment works, the treatment by such works removes all or any part of such toxic pollutant and the discharge from such works does not violate that effluent limitation or standard which would be applicable to such toxic pollutant if it were discharged by such source other than through a publicly owned treatment works, and does not prevent sludge use or disposal by such works in accordance with section 1345 of this title, then the pretreatment requirements for the sources actually discharging such toxic pollutant into such publicly owned treatment works may be revised by the owner or operator of such works to reflect the removal of such toxic pollutant by such works.

### Exhibit B

Section 405(d) of the Clean Water Act, 33 U.S.C. § 1345(d), provides as follows:

The Administrator, after consultation with appropriate Federal and State agencies and other interested persons, shall develop and publish, within one year after December 27, 1977, and from time to time thereafter, regulations providing guidelines for the disposal of sludge and the utilization of sludge for various purposes. Such regulations shall—

(1) identify uses for sludge, including disposal;

(2) specify factors to be taken into account in determining the measures and practices applicable to each such use or disposal (including publication of information on costs);

(3) identify concentrations of pollutants which interfere with each such use or disposal.

The Administrator is authorized to revise any regulation issued under this subsection.

### Exhibit C

The 1984 removal credit rule, 49 Fed.Reg. 31212 (1984) (codified at § 403.7 (1985)) provides as follows:

§ 403.7 Removal credits.

(a) *Introduction*—(1) *Definitions.*

For the purpose of this section:

(i) "Removal" means a reduction in the amount of a pollutant in the POTW's effluent or alteration of the nature of a pollutant during treatment at the POTW. The reduction or alteration can be obtained by physical, chemical or biological means and may be the result of specifically designed

POTW capabilities or may be incidental to the operation of the treatment system. Removal as used in this subpart shall not mean dilution of a pollutant in the POTW.

(ii) "Sludge Requirements" shall mean the following statutory provisions and regulations or permits issued thereunder (or more stringent State or local regulations): section 405 of the Clean Water Act; the Solid Waste Disposal Act (SWDA) (including Title II more commonly referred to as the Resource Conservation Recovery Act (RCRA) and State regulations contained in any State sludge management plan prepared pursuant to Subtitle D of SWDA); the Clean Air Act; the Toxic Substances Control Act; and the Marine Protection, Research and Sanctuaries Act.

(2) *General.* Any POTW receiving wastes from an Industrial User to which a categorical Pretreatment Standard(s) applies may, at its discretion and subject to the conditions of this section, grant removal credits to reflect removal by the POTW of pollutants specified in the categorical Pretreatment Standard(s). The POTW may grant a removal credit equal to or, at its discretion, less than its consistent removal rate. Upon being granted a removal credit, each affected Industrial User shall calculate its revised discharge limits in accordance with subparagraph (4) of this paragraph. Removal credits may only be given for indicator or surrogate pollutants regulated in a categorical Pretreatment Standard if the categorical Pretreatment Standard so specifies.

(3) *Conditions for authorization to give removal credits.* A POTW is authorized to give removal credits only if the following conditions are met:

(i) *Application.* The POTW applies for, and receives, authorization from the Approval Authority to give a removal credit in accordance with the requirements and procedures specified in paragraph (e) of this section.

(ii) *Consistent removal determination.* The POTW demonstrates and continues to achieve consistent removal of the pollutant in accordance with paragraph (b) of this section.

(iii) *POTW local pretreatment program.* The POTW has an approved pretreatment program in accordance with and to the extent required by Part 403; provided, however, a POTW which does not have an approved pretreatment program may, pending approval of such a program, conditionally give credits as provided in paragraph (d) of this section.

(iv) *Sludge requirements.* The granting of removal credits will not cause the POTW to violate the local, State and Federal Sludge Requirements which apply to the sludge management method chosen by the POTW. Alternatively, the POTW can demonstrate to the Approval Authority that even though it is not presently in compliance with applicable Sludge Requirements, it will be in compliance when the Industrial User(s) to whom the removal credit would apply is required to meet its categorical Pretreatment Standard(s) as modified by the removal credit. If granting removal credits forces a POTW to incur greater sludge management costs than would be incurred in the absence of granting removal credits, the additional sludge management costs will not be eligible for EPA grant assistance.

(v) *NPDES permit limitations.* The granting of removal credits will not cause a violation of the POTW's permit limitations or conditions. Alternatively, the POTW can demonstrate to the Approval Authority that even though it is not presently in compliance with applicable limitations and conditions in its NPDES permit, it will be in compliance when the Industrial User(s) to whom the removal credit would apply is required to meet its categorical Pretreatment Standard(s), as modified by the removal credit provision.

(4) *Calculation of revised discharge limits.* Revised discharge limits for a specific pollutant shall be derived by use of the following formula:

$$y = \frac{X}{1-r}$$

where

x= pollutant discharge limit specified in the applicable categorical Pretreatment Standard

r= removal credit for that pollutant as established under paragraph (b) of this section (percentage removal expressed as a proportion, i.e., a number between 0 and 1)

y= revised discharge limit for the specified pollutant (expressed in same units as x)

(b) *Establishment of Removal Credit; Demonstration of Consistent Removal.* A POTW may be authorized to grant a removal credit that does not exceed its consistent removal rate. In order to demonstrate consistent removal, the POTW shall, for each pollutant with respect to which removal credit authorization is sought, collect influent and effluent data and calculate consistent removal in accordance with the following requirements. As a condition of retaining removal credit authorization, the POTW's consistent removal must continue to be equal to or greater than the removal credit.

(1) *Number of samples.* At least twelve representative samples of influent and effluent shall be taken at approximately equal intervals throughout one full year. Upon concurrence of the Approval Authority, a POTW may utilize an historical data base either in lieu of or as a supplement to these twelve samples. In order to be approved, the historical data base must be representative of the yearly and seasonal conditions to which the POTW is subject and be representative of the POTW's performance for at least one year. As an alternative to the above, a POTW, upon concurrence of the Approval Authority, may utilize an alternative sampling design, as long as the alternative design provides for samples to be taken at times which are representative of the POTW's normal operating conditions and the different seasonal conditions to which the POTW is subject.

(2) *Method of Sampling.* The POTW must use the composite sampling method unless the grab sampling method is more appropriate. A description of these methods and suggestions on when each method should be used are included in Appendix E as guidance.

(3) *Method of Analysis for Pollutants.* The POTW shall analyze the samples for pollutants in accordance with the analytical techniques prescribed in 40 CFR Part 136. If 40 CFR Part 136 does not contain analytical techniques for the pollutant in question, or if the Approval Authority determines that Part 136 analytical techniques are inappropriate, the analysis shall be performed using validated analytical methods or any other applicable analytical procedures approved by the Approval Authority, including procedures suggested by the POTW.

(4) *Calculation of Consistent Removal.* (i) The consistent removal, denoted by r, for a specific pollutant shall be the difference between the average concentrations of the pollutant in the influent of the POTW, denoted by I, and the average concentrations of the pollutant in the effluent of the POTW, denoted by E, divided by the average concentrations of the pollutant in the influent, denoted by I, as follows:

$$r = \frac{I-E}{I}$$

The average concentrations of the pollutant in the influent and effluent shall be calculated by taking the arithmetic average of all influent and effluent data, respectively. In calculating consistent removal under the subparagraph, all sample data must be used.

(ii) If a pollutant is only measurable in some of the influent and effluent samples (including the situation where it is not measurable in any effluent samples) and the POTW elects to calculate consistent removal in accordance with paragraph (b)(4)(i), influent and effluent observations below the limit of detectability should be assigned a value equal to the limit of detectability. In calculating consistent removal under paragraph (b)(4)(i), all sample data, including those set at the limit of detectability, must be used.

(iii) If a pollutant is only measurable in some influent and effluent samples (including the situation where it is not measurable in any effluent samples) and the POTW elects not to calculate consistent removal in

accordance with paragraph (b)(4)(i), or if a pollutant is not measurable in any of the influent samples (in which case the sample data may not be used to calculate consistent removal in accordance with paragraph (b)(4)(i)), the POTW may (A) use historical data as provided in paragraph (b)(1) of this section to calculate consistent removal, or (B) upon the concurrence of the Approval Authority, the POTW may use data from treatability studies, demonstrated removal at similar treatment facilities or provide some other alternative means to demonstrate its consistent removal.

(iv) For purposes of this paragraph "measurable" refers to the ability of the analytical method to quantify as well as identify the presence of the pollutant in question. "Limit of detectability" refers to the lowest limit at which the analytical method can quantify the pollutant in question.

(c) *Provisional credits.* For pollutants which are not being discharged currently (i.e., new or modified facilities, or production changes) the POTW may apply for authorization to give removal credits prior to the initial discharge of the pollutant. Consistent removal shall be based provisionally on data from treatability studies or demonstrated removal at other treatment facilities where the quality and quantity of influent are similar. Within 18 months after the commencement of discharge of pollutants in question, consistent removal must be demonstrated pursuant to the requirements of paragraph (b). If, within 18 months after the commencement of the discharge of the pollutant in question, the POTW cannot demonstrate consistent removal pursuant to the requirements of paragraph (b) of this section, the authority to grant provisional removal credits shall be terminated by the Approval Authority and all Industrial Users to whom the revised discharge limits had been applied shall achieve compliance with the applicable categorical Pretreatment Standard(s) within a reasonable time, not to exceed the period of time prescribed in the applicable categorical Pretreatment Standard(s), as may be specified by the Approval Authority.

(d) *Exception to POTW Pretreatment Program Requirement.* A POTW required to develop a local pretreatment program by § 403.8 may conditionally give removal credits pending approval of such a program in accordance with the following terms and conditions:

(1) All Industrial Users who are currently subject to a categorical Pretreatment Standard and who wish conditionally to receive a removal credit must submit to the POTW the information required in § 403.-12(b)(1)–(7) (except new or modified industrial users must only submit the information required by § 403.12(b)(1)–(6)), pertaining to the categorical Pretreatment Standard as modified by the removal credit. The Industrial Users shall indicate what additional technology, if any, will be needed to comply with the categorical Pretreatment Standard(s) as modified by the removal credit;

(2) The POTW must have submitted to the Approval Authority an application for pretreatment program approval meeting the requirements of §§ 403.8 and 403.9 in a timely manner, not to exceed the time limitation set forth in a compliance schedule for development of a pretreatment program included in the POTW's NPDES permit, but in not [sic] case later than July 1, 1983, where no permit deadline exists;

(3) The POTW must:

(i) Compile and submit data demonstrating its consistent removal in accordance with paragraph (b) of this section;

(ii) Comply with the conditions specified in paragraph (a)(3) of this section; and

(iii) Submit a complete application for removal credit authority in accordance with paragraph (e) of this section;

(4) If a POTW receives authority to grant conditional removal credits and the Approval Authority subsequently makes a final determination, after appropriate notice, that the POTW failed to comply with the conditions in paragraphs (d)(2) and (3)

of this section, the authority to grant conditional removal credits shall be terminated by the Approval Authority and all Industrial Users to whom the revised discharge limits had been applied shall achieve compliance with the applicable categorical Pretreatment Standard(s) within a reasonable time, not to exceed the period of time prescribed in the applicable categorical Pretreatment Standard(s), as may be specified by the Approval Authority.

(5) If a POTW grants conditional removal credits and the POTW or the Approval Authority subsequently makes a final determination, after appropriate notice, that the Industrial User(s) failed to comply with the conditions in paragraph (d)(1) of this section, the conditional credit shall be terminated by the POTW or the Approval Authority for the non-complying Industrial User(s) to whom the revised discharge limits had been applied shall achieve compliance with the applicable categorical Pretreatment Standard(s) within a reasonable time, not to exceed the period of time prescribed in the applicable categorical Pretreatment Standard(s), as may be specified by the Approval Authority. The conditional credit shall not be terminated where a violation of the provisions of this paragraph results from causes entirely outside of the control of the Industrial User(s) or the Industrial User(s) had demonstrated substantial compliance.

(6) The Approval Authority may elect not to review an application for conditional removal credit authority upon receipt of such application, in which case the conditionally revised discharge limits will remain in effect until reviewed by the Approval Authority. This review may occur at any time in accordance with the procedures of § 403.11, but in no event later than the time of any pretreatment program approval or any NPDES permit reissuance thereunder.

(e) *POTW application for authorization to give removal credits and Approval Authority review—(1) Who must apply.* Any POTW that wants to give a removal credit must apply for authorization from the Approval Authority.

(2) *To whom application made.* An application for authorization to give removal credits (or modify existing ones) shall be submitted by the POTW to the Approval Authority.

(3) *When to apply.* A POTW may apply for authorization to give or modify removal credits at any time.

(4) *Contents of the Application.* An application for authorization to give removal credits must be supported by the following information:

(i) *List of pollutants.* A list of pollutants for which removal credits are proposed.

(ii) *Consistent Removal Data.* The data required pursuant to paragraph (b).

(iii) *Calculation of revised discharge limits.* Proposed revised discharge limits for each affected subcategory of Industrial Users calculated in accordance with paragraph (a)(4) of this section.

(iv) *Local Pretreatment Program Certification.* A certification that the POTW has an approved local pretreatment program or qualifies for the exception to this requirement found at paragraph (d) of this section.

(v) *Sludge Management Certification.* A specific description of the POTW's current methods of using or disposing of its sludge and a certification that the granting of removal credits will not cause a violation of the sludge requirements identified in paragraph (a)(3)(iv) of this section.

(vi) *NPDES Permit Limit Certification.* A certification that the granting of removal credits will not cause a violation of the POTW's NPDES permit limits and conditions as required in paragraph (a)(3)(v) of this section.

(5) *Approval Authority Review.* The Approval Authority shall review the POTW's application for authorization to give or modify removal credits in accordance with the procedures of § 403.11 and shall, in no event, have more that [sic] 180

days from public notice of an application to complete review.

(6) *EPA review of State removal credit approvals.* Where the NPDES State has an approved pretreatment program, the Regional Administrator · may agree in the Memorandum of Agreement under 40 CFR 123.24(d) to waive the right to review and object to submissions for authority to grant removal credits. Such an agreement shall not restrict the Regional Administrator's right to comment upon or object to permits issued to POTW's except to the extent 40 CFR 123.24(d) allows such restriction.

(7) Nothing in these regulations precludes an Industrial User or other interested party from assisting the POTW in preparing and presenting the information necessary to apply for authorization.

(f) *Continuation and withdrawal of authorization*—(1) *Effect of authorization.* (i) Once a POTW has received authorization to grant removal credits for a particular pollutant regulated in a categorical Pretreatment Standard it may automatically extend that removal credit to the same pollutant when it is regulated in other categorical standards, unless granting the removal credit will cause the POTW to violate the sludge requirements identified in (a)(3)(iv) of this section or its NPDES permit limits and conditions as required by (a)(3)(v). If a POTW elects at a later time to extend removal credits to a certain categorical Pretreatment Standard, industrial subcategory or one or more Industrial Users that initially were not granted removal credits, it must notify the Approval Authority.

(2) *Inclusion in POTW permit.* Once authority is granted, the removal credits shall be included in the POTW's NPDES Permit as soon as possible and shall become an enforceable requirement of the POTW's NPDES permit. The removal credits will remain in effect for the term of the POTW's NPDES permit, provided the POTW maintains compliance with the conditions specified in subparagraph (4) of this paragraph.

(3) *Compliance monitoring.* Following authorization to give removal credits, a POTW shall continue to monitor and report on (at such intervals as may be specified by the Approval Authority, but in no case less than once per year) the POTW's removal capabilities. A minimum of one representative sample per month during the reporting period is required, and all sampling data must be included in the POTW's compliance report.

(4) *Modification or withdrawal of removal credits.* (i) Compliance with the conditions in paragraph (a)(3)(iii)–(v) of this section may be examined by the Approval Authority whenever it elects and must, at the very least, be examined whenever the POTW's NPDES permit is reissued. If the Approval Authority determines, on the basis of compliance monitoring reports or other information available to it, that the conditions specified in paragraphs (a)(3)(iii)–(v) of this section are not being met, the Approval Authority shall withdraw the POTW's authority to grant removal credits or modify those credits in accordance with the procedures specified in subparagraph (iii) below.

(ii) If, during the term of the POTW's NPDES permit, the Approval Authority determines that the POTW's consistent removal rate is consistently and substantially lower than the removal credit specified in the POTW's NPDES permit, the Approval Authority shall either withdraw the POTW's authority to grant removal credits or modify those credits in accordance with the procedures specified in subparagraph (iii) below.

(iii) If the Approval Authority tentatively determines, under subparagraphs (i) or (ii) above, that the withdrawal of a POTW's authority to grant removal credits or modification of those credits is warranted, the Approval Authority shall, in accordance with the procedures specified in § 403.-11(b)(1) and (2) of this section, issue a public notice, provide a public comment period of at least 30 days and provide an opportunity for interested persons to request a public hearing. The mailing list for the

public notice shall include, at a minimum, the POTW and Industrial Users to whom revised discharge limits have been applied. If the Approval Authority finally determines to withdraw the POTW's authority to grant removal credits or to modify those removal credits the POTW is authorized to grant, it shall notify the POTW, all Industrial Users to whom revised limits have been applied and each person who has requested individual notice of its decision and the basis for that decision. Notice shall also be published in the same newspaper as the original notice of the tentative determination was published. Following such notice and modification or withdrawal, all Industrial Users to whom revised discharge limits have been applied shall be subject to the modified discharge limits or the discharge limits prescribed in the applicable categorical Pretreatment Standard(s), as appropriate, and shall achieve compliance with such limits within a reasonable time, not to exceed the period of time prescribed in the applicable categorical Pretreatment Standard(s), as may be specified by the Approval Authority.

(g) *Removal credits in State-run pretreatment programs under § 403.10(e).* Where an NPDES State with an approved pretreatment program elects to implement a local pretreatment program in lieu or [sic] requiring the POTW to develop such a program (as provided in 403.10(e)), the POTW will not be required to develop a pretreatment program as a precondition to obtaining authorization to give removal credits. The POTW will, however, be required to comply with the other conditions of paragraph (a)(3) of this section.